Filed 5/17/21  Certified for Publication 6/7/21 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| LEO PERRY et al., | D077064 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2017-00045772-CU-MC-CTL) |
| CITY OF SAN DIEGO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Robert P. Ottilie for Plaintiffs and Appellants Leo Perry, Margaret Parks, Bruce Waterman, Sapna Iyer, Casey Culbertson, Peter Chiraseveenuprapund, Jo Ann Yang, Therodoros Piknis, Robert Stephens, Kimberley Deede, Justin McBride, Traci Snow, Kevin Bowens, John Mannion, Hadley Le, Brian Armston and Edward Cramp.

Mara W. Elliot, City Attorney, George F. Schaefer, Assistant City Attorney, and Jenny K. Goodman, Deputy City Attorney for Defendant and Respondent.

Homeowners Leo Perry, Margaret Parks, Bruce Waterman, Sapna Iyer, Casey Culbertson, Peter Chiraseveenuprapund, Jo Ann Yang, Therodoros Piknis, Robert Stephens, Kimberley Deede, Justin McBride, Traci Snow, Kevin Bowens, John Mannion, Hadley Le, Brian Armston and Edward Cramp (collectively, Homeowners) sought free refuse collection from the City of San Diego for their 12 condominiums located in a gated complex in the Hillcrest neighborhood of San Diego. The City refused the request to initiate service on the grounds the complex did not qualify under its Waste Management Regulation (WMR). In response to the denial of service, the Homeowners brought suit against the City asserting the WMR was issued in violation of the San Diego Municipal Code, and claiming that the City's use of the WMR to deny them service violated their equal protection rights.

After discovery, the City brought a successful motion for summary judgment. Thereafter, the trial court entered judgment in the City's favor. The Homeowners now appeal, contending the court erred by finding the WMR was validly promulgated and that there were no triable issues of fact with respect to their equal protection claims. As we shall explain, we conclude the WMR is lawful and the court did not err by dismissing the Homeowners' claims. The judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

In early 2016, the developer of the 12 condominiums at issue obtained a tentative map waiver allowing for the subdivision of a single parcel located at 3740 and 3750 Third Avenue. After the development of the condominiums, they were sold to the individual Homeowners, who are the plaintiffs and appellants in this litigation. In the fall of 2016, the Homeowners submitted an Application for Refuse and Recycling Collection Services for the properties to the City's Environmental Services Department (ESD). The City

2

determined the property was a multi-family residential facility and evaluated the application under the WMR's multi-family eligibility criteria. ESD employee Albert Villa visited the property to determine its eligibility for service under the WMR. Villa completed a form worksheet for the property determining that it was not eligible for City service because the property lacked sufficient "setout space" in the designated pickup location for the number of trash cans (24) required by the WMR for the complex's 12 units.

Based on Villa's determination, ESD program manager Matthew Cleary prepared a denial letter to the Homeowners informing them they were not eligible for City provided refuse and recycling collection under the WMR because the property had insufficient setout space. The Homeowners appealed the decision. As a result, Cleary visited the property himself. Cleary consulted with the City's Developmental Services Department, which also classified the property as multi-family. Cleary also confirmed that the 12 units would require 120 feet of setout space for 24 cans under the WMR and that the alley adjacent to the property only provided 72.5 feet of space. Cleary provided his findings confirming Villa's initial determination to ESD Director Mario Sierra.

Sierra submitted a declaration in the summary judgment proceeding attesting that he conducted his own independent investigation that included two visits to the property and several calls and a meeting with the property developer, Michael Turk, Jr. After completing his investigation, Sierra determined the property was not eligible for refuse and recycling collection because the property did not have "reasonable access," as that term is defined in the WMR, to a City-designated collection point. On November 3, 2016, Sierra sent a letter to Turk explaining the City's denial because of a lack of reasonable access. Specifically, Sierra stated "reasonable access does not

3

exist for the Property because residents would have to move their collection containers from either their individual garages across a private communal driveway or their respective front doors across a private communal walkway to a City-designated collection point in the public alley behind the Property."

Thereafter, the Homeowners retained counsel who sent the City a demand letter arguing the denial was improper. On December 15, 2016, the City Attorney's office responded with a detailed letter outlining the basis for the City's rejection of the Homeowners' request for service. The letter provided background about the San Diego Municipal Code provision on which the Homeowners' demand letter was based (San Diego Mun. Code, § 66.0127) and the WMR, and explained the request for service was denied because of a lack of both setout space and reasonable access.

After filing an unsuccessful claim with the City, on November 30, 2017, the Homeowners filed their complaint initiating this litigation. The operative complaint, the Verified First Amended Complaint and Petition (FAC), was filed on April 5, 2018. The FAC alleges four causes of action based on the City's alleged violation of the Homeowners' equal protection rights: (1) declaratory relief, (2) mandamus, (3) injunctive relief, and (4) breach of statutory duties. Following over a year of discovery, on July 12, 2019, the City moved for summary judgment. After briefing and the submission of evidence, on September 30, 2019, the trial court conducted a hearing on the motion. Before the hearing, the court published its tentative ruling granting the motion and rejecting the plaintiffs' claim that the WMR was invalid. The court found the WMR was authorized by San Diego Municipal Code section 66.0127, the code provision governing refuse collection as amended by ballot initiative in 1986, and 66.0124. The trial court also rejected the Homeowners' equal protection claims, finding no triable issues of fact related

4

to the City's denial of service. After a lengthy oral argument, the court confirmed its tentative ruling granting the City's motion for summary judgment.

On October 15, 2019, the Homeowners filed a motion for reconsideration under Code of Civil Procedure section 1008 based on what they characterized as newly discovered documents concerning the City's interpretation of San Diego Municipal Code section 66.0127, subdivision (c) related to the collection of refuse from vacation rentals in the Mission Beach neighborhood of San Diego. The City opposed the motion. At the November 8, 2019 hearing on the motion, Homeowners' counsel conceded the "new" evidence had been produced in response to its discovery requests before the summary judgment proceedings, but that it was not included in their opposition because counsel had not timely reviewed the documents.

In its ruling on the motion for reconsideration, the court found relief was not available because the documents on which the motion was based were not new; rather, they were produced to the Homeowners by the City prior to summary judgment and also had been publicly available on the City's website since November 2018. The court also noted that even if it were to assume the evidence was new, it would not revise its earlier order granting summary judgment. On November 19, 2019, the Homeowners filed a notice of appeal from the summary judgment order. On November 22, 2019, the court entered judgment in favor of the City and the following week the Homeowners filed an amended notice of appeal from the judgment.

## DISCUSSION

### I

### *Summary Judgment Standards*

Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is to be granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. A defendant "moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) A defendant may meet this burden either by showing that one or more elements of a cause of action cannot be established or by showing that there is a complete defense. (*Ibid.*) If the defendant's prima facie case is met, the burden shifts to the plaintiff to show the existence of a triable issue of material fact with respect to that cause of action or defense. (*Aguilar*, at p. 849; *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261.)

We review a summary judgment ruling de novo. (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.) "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." (*Lenane v. Continental Maritime of San Diego, Inc.* (1998) 61 Cal.App.4th 1073, 1079.) "[W]e are not bound by the trial court's stated reasons for its ruling on the motion; we review only the trial court's ruling and not its rationale." (*Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1402.)

## II

### *Validity of the WMR*

As discussed, the Homeowners challenge the trial court's determination that the WMR is valid. The City responds that the regulation was properly promulgated, and the Homeowners' interpretation of the San Diego Municipal Code provision under which the regulation was enacted is incorrect. We agree with the City.

### A

### *History of the People's Ordinance*

In 1919, the People of San Diego voted to adopt Ordinance No. 7691, known as the "People's Ordinance." The People's Ordinance imposed on the City the duty to collect refuse (defined in the Ordinance as "garbage, waste matter, ashes, night soil, market refuse and dead animals") within the City's geographical limits at least once each week.

The Ordinance has been amended twice by ballot initiative, first in 1981 and again in 1986. The purpose of the 1981 amendment was to limit "the amount of refuse which could be collected from commercial/industrial sources" and establish "fees for private refuse haulers dumping nonresidential refuse in city landfills." The amendment, however, left much of the original ordinance's language intact and was inconsistent with the actual collection services being provided by the City at the time.

As a result, in 1986, the City government proposed comprehensive changes to the People's Ordinance. Those changes were enacted by voters that year and remain in place today. A report by the City's manager to the Rules Committee of the City Council explained the purposes of the 1986 amendments were to: (1) clarify the 1981 change that eliminated the City's obligation to collect commercial refuse (viewed by the City Manager as

subsidization of commercial activity); (2) eliminate the City's collection of residential refuse for residences located on private property, particularly residences within developments "which utilize streets that do not meet City standards"[1]; (3) allow the adjustment of "rules and regulations involving day to day collection and disposal methods" by the City Manager, allowing the City "to adjust to modern technology and/or emergencies as they evolve"; and (4) eliminate antiquated language in the ordinance.

The report also stated a goal of the proposed revision was "to create an equal standard for all city residents: curbside pickup of residential trash. If residents of apartment complexes, condominiums and other planned residential developments are willing to comply with [the City's] standard, then they will continue to be eligible for city services. If they desire a higher level of service, then they will be free to contract with private haulers for that service."

The ballot materials for the amendments stated they would define the terms "refuse," "residential refuse," "nonresidential refuse," "residential facility," "nontransient occupancy" and "small business enterprise." The materials also explained the ordinance would "[a]uthorize the City Council to regulate by ordinance the collection, transportation and disposal of refuse so that residential refuse shall be collected, transported, and disposed of by the City at least once each week with no City fee imposed for same by City Forces."

The ballot materials explained that the City "shall not collect nonresidential refuse," except from small businesses limited to an amount no

---

1    The amendment contained a grandfathering provision for those residences located on private property for which the City had obtained a hold harmless agreement preventing liability for damage to such property.

8

greater than 150% of the refuse generated by an average residential dwelling. The ballot materials also stated that fees established by the City for nonresidential refuse cannot exceed the ascertainable costs to the City for such services. Lastly, the materials explained the amendment "[p]rovides that pursuant to ordinance *the City Manager may promulgate rules and regulations to provide for the collection, transportation and disposal of refuse.*"[2] (Italics added.)

The 1986 initiative added the following provision to the San Diego Municipal Code, currently codified at section 66.0127:

(a) As used in this People's Ordinance:

(1) "Refuse" means waste material of any nature or description generated within the City limits, excluding hazardous or toxic chemicals, wastes, materials or substances as defined now or hereafter by federal or state law or regulation;

(2) "Residential Refuse" means refuse, as defined herein, normally generated from a Residential Facility and which is placed at the curb line of public streets at designated times in approved containers;

(3) "Nonresidential Refuse" means all refuse that is not Residential Refuse, as defined herein;

(4) "Residential Facility" means a single family or multi–family residential structure used and occupied for Nontransient Occupancy;

(5) "Nontransient Occupancy" means occupancy through ownership, lease or rental for periods of one month or more.

---

[2]  The parties agree that the references to manager in the San Diego Municipal Code now apply to the mayor.

(6) "Small business enterprise" means a commercial establishment providing sales and services to the public and licensed or taxed by the City.

(b) No person shall collect, transport or dispose of any refuse except as provided herein.

(c) The City Council shall by ordinance regulate and control the collection, transportation and disposal of all refuse provided that:

(1) Residential Refuse shall be collected, transported and disposed of by the City at least once each week and there shall be no City fee imposed or charged for this service by City forces;

(2) The City shall not collect Nonresidential Refuse, except that Nonresidential Refuse from a small business enterprise may be collected by City Forces if authorized by the City Council and limited to once a week service in an amount no greater than one hundred fifty percent (150%) of the refuse generated by an average City residential dwelling unit. There shall be no City fee imposed or charged for this service by City Forces;

(3) The City shall not enter upon any private property to collect any refuse except in the case of public emergency or pursuant to a hold harmless agreement in effect as of the date of adoption of this ordinance;

(4) Fees established by ordinance of the City Council for disposal of Nonresidential Refuse shall not exceed the full ascertainable cost to the City for such disposal.

(d)  Pursuant to the ordinance duly adopted by the City Council, the City Manager may then duly promulgate such rules and regulations as are appropriate to provide for the collection, transportation and disposal of refuse.[ 3]

---

3      The provision was originally numbered 66.0123 in 1986.

Section 66.0124 of the San Diego Municipal Code, whose history is not illuminated in the record, also provides authority for the adoption of regulations governing the collection of refuse. It states: "Rules and Regulations. [¶] The collection and subsequent transportation and disposal of refuse within the City of San Diego is under the supervision of the Manager who shall have the power to promulgate rules and regulations regulating such collection and subsequent transportation and disposal, including but not limited to: [¶] (a) Collection routes and scheduling and designation of disposal sites and any limitations thereon; [¶] (b) Service standards and pickup locations; and [¶] (c) Handling of hazardous materials. [¶] A copy of said rules and regulations and all amendments thereto shall be sent by registered or certified mail, postage prepaid, to all affected franchises addressed to their last place of business. To the extent not otherwise provided by law, it shall be unlawful for a franchisee to collect and subsequently transport or dispose of refuse contrary to any regulation, order, permit or requirement promulgated by the Manager."

B

*The Waste Management Regulation*

In 2010, under the authority provided by these two municipal code provisions, the City adopted the WMR. The regulation's stated purpose "is to set forth the criteria for determining whether a residential facility is eligible to receive City Force provided Collection Services, to establish standards for Collection Services provided by City Forces, to regulate the placement of refuse, recycling, and greenery containers for collection, and to provide limitations on City Force Collection Services to any location which would require the violation of any federal, state or local statute, regulation or ordinance including but not limited to the California Vehicle Code." The

11

WMR has been maintained on the City's website since its adoption at <https://www.sandiego.gov/sites/default/files/legacy/ environmental-services/pdf/SMiramarPla10080617330.pdf> [as of May 17, 2021], archived at <https://perma.cc/QH42-3DU7>.

Section II of the WMR sets forth three general eligibility requirements for "City Force" residential refuse collections services: (1) The residence must be located in the corporate limits of the city. (2) The residence must be located on, addressed on, and contiguous to a public street or alley with reasonable access to a collection point and safe access for City collection vehicles. Additionally, there must be adequate space for proper placement and separation of the regulation's required number of containers without obstructing traffic. (3) Finally, the residence must have adequate on-site storage space for the requisite containers.

Section II of the WMR also contains four "limitations on services": (1) The City will not service residences in gated communities if any of the residences in the community do not have reasonable access to a dedicated public street or alley. The regulation's definitions state "Reasonable Access means the Residential Facility is located immediately adjacent and contiguous to a designated collection point at the curb line of a City dedicated public right-of-way which is directly accessible from the Residential Facility property and does not require moving the collection container across a private street, private alley, private communal driveway, or other private property aside from the Residential Facility property." (2) The City will not service multi-family residences without adequate storage space on the property for the appropriate number of containers. (3) The City will not service residences which require City Forces to travel across a private street or alley. And (4) the City will not service multi-family residential units in a mixed-use

12

facility where the commercial units receive service from a City-franchised collection company.

The regulation contains additional eligibility requirements for multi-family residential facilities, which are set forth in "Attachment 1" to the regulation.[4] These additional requirements are imposed in Section III of the WMR, titled "Initiation of City Force Refuse Collection Services," which states "[t]he criteria for determining the eligibility of Multi-family Residential Facility to receive City Force provided Collection Services are shown on Attachment 1. All of the criteria must be met or the facility will be deemed ineligible to receive City Force provided Collection Services."

Section III further provides that "Requests for the initiation of City Force provided Collection Services for multi-family complexes, apartments, condominium projects, etc., will be approved or disapproved based on the ability of the entire complex to meet the standards in these rules and regulations, provided that a residential unit, within a multi-family complex, which has Reasonable Access as defined herein and meets and complies with the other rules and regulations herein may receive City Force provided Refuse Collection Services at the Director's discretion. Service will not be provided to a single unit or multiple units within a complex unless adequate onsite storage and curb side or alley frontage set out space is available for all units and all Refuse, Recyclable Material, and Yard Waste containers."

---

[4] The regulation defines "Residential Facility" as "a single family or multi-family residential structure used and occupied for Non-Transient Occupancy that is addressed and located on and can be serviced from a dedicated public street or dedicated public alley within the City." Non-transient occupancy is defined as "occupancy through ownership, lease or rental for periods of one month or more."

13

Section IV of the WMR sets forth "Conditions for Service." This section includes the City's requirement for the amount of curb or alley space needed for refuse containers. It states that "Containers must be placed at the curb line of a dedicated public street or dedicated public alley with the wheels against the curb and at least three feet from other automated collection containers, parked cars, lamp posts, telephone poles and guy wires, mailboxes or any other obstruction. Containers must be placed side-by-side, not one in front of another, and must not be placed directly under a tree, low utility wire, basketball hoop, building overhang or other overhead obstruction."

Attachment 1 contains a substantially similar requirement for multi-family facilities. It states "[t]he dedicated public streets and/or dedicated public alleys which will serve as collection locations must have adequate space for the proper placement and separation of all Refuse and Recyclable Material containers without obstructing bike lanes, on-site parking, or the safe and normal flow of traffic; violating any laws; or creating safety hazards for the public, the collection vehicle or the collection crew. The amount of curbside or alley frontage available for container set out must be equal to or greater than five (5) linear feet for each container using the number of units in the complex and the minimum container requirements …."[5]

---

[5] The City's brief explains that its "approved containers are about [two feet] in width," thus the five feet requirement in the multi-family attachment is equivalent to the requirement in the conditions of service for all residences, contained in Section IV of the WMR, of three feet of space plus two feet for each container.

14

C

*Analysis*

As an initial matter, we address the City's assertion in its brief that the Homeowner's operative complaint did not challenge the validity of the WMR, rather only its application to these Homeowners' properties. We do not agree with this narrow characterization of the Homeowners' claims. Rather, the FAC alleges that the City "cannot impose an arbitrary and capricious regulation to defeat the material purpose of the underlying Ordinance" and its promulgation of the WMR was "in contradiction to [its] obligations under the People's Ordinance of 1919, even as amended." Further, the complaint asserts that the setout space and reasonable access requirements of the WMR are not "lawfully adopted regulations" because they defeat the ordinance's basic purpose. These claims constitute a challenge to the validity of the WMR.

In addition, the Homeowner's opposition to the City's motion for summary judgment made clear its position that the WMR was not enforceable—against the Homeowners or any other City resident—because the WMR's eligibility requirements exceeded the scope of authority granted to the City by the 1986 amendment to People's Ordinance. The Homeowners' position in the trial court was that the motion for summary judgment should be denied because the promulgation of the WMR was an unauthorized elimination of services in direct conflict with the People's Ordinance, and not a valid exercise of regulatory authority. Finally, the trial court explicitly ruled that "[t]he standards set forth within the WMR regulation fall squarely within the scope of the authority conferred on the Mayor by [San Diego Municipal Code] sections 66.1024 and 66.127(d)." Accordingly, the issue is properly before this court.

15

While we agree with the Homeowners that the validity of the WMR was litigated in the trial court and is properly before this court, we reject the Homeowners' contention that the WMR exceeded the scope of authority granted to the City by the 1986 ballot initiative. The City's promulgation of the WMR was a quasi-legislative act. "It is a 'black letter' proposition that there are two categories of administrative rules and that the distinction between them derives from their different sources and ultimately from the constitutional doctrine of the separation of powers. One kind—quasi-legislative rules—represents an authentic form of substantive lawmaking: Within its jurisdiction, the agency [here, the City] has been delegated the [electorate's] lawmaking power. [Citations.] Because agencies granted such substantive rulemaking power are truly 'making law,' their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, the scope of its review is narrow. If satisfied that the rule in question lay within the lawmaking authority delegated by [the electorate], and that it is reasonably necessary to implement the purpose of [the law], judicial review is at an end." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10–11.)

Stated another way, " '[i]n reviewing the legality of a regulation adopted pursuant to a delegation of legislative power, the judicial function is limited to determining whether the regulation (1) is "within the scope of the authority conferred" [citation] and (2) is "reasonably necessary to effectuate the purpose of the statute" [citation ]' (*Agricultural Labor Relations Board v. Superior Court* (1976) 16 Cal.3d 392, 411.) 'These issues do not present a matter for the independent judgment of an appellate tribunal; rather, both come to this court freighted with [a] strong presumption of regularity....' (*Ralphs Grocery Co. v. Reimel* (1968) 69 Cal.2d 172, 175.) Our inquiry

16

necessarily is confined to the question whether the classification is 'arbitrary, capricious or [without] reasonable or rational basis.' " (*Wallace Berrie & Co. v. State Bd. of Equalization* (1985) 40 Cal.3d 60, 65.)

As set forth above, the 1986 amendment to the People's ordinance, specifically the change contained in San Diego Municipal Code section 66.0127, subdivision (d), gives the City the authority to adopt the regulations at issue here. It states that the City may "duly promulgate such rules and regulations as are appropriate to provide for the collection, transportation and disposal of refuse." The rules at issue do just this. (See *Castaneda v. Holcomb* (1981) 114 Cal.App.3d 939, 942 ["If the language of the provision is free of ambiguity, it must be given its plain meaning; rules of statutory construction are applied only where there is ambiguity or conflict in the provisions of the charter or statute, or a literal interpretation would lead to absurd consequences."].) Contrary to the Homeowners' assertion that the regulation contravenes the People's Ordinance, the WMR appropriately sets standards for residences to obtain the free collection provided by the City. The spacing and access requirements challenged by the Homeowners directly concern "the collection" of refuse and allow the City to provide cost-effective and safe services. As the trial court stated in its order granting summary judgment, "the WMR is reasonably necessary to address the operation efficiency, safety, and cost-effective administration of the City's waste management system."

Further, the regulation also falls within the authority granted to the City by San Diego Municipal Code section 66.0124, which provides that "[t]he collection and subsequent transportation and disposal of refuse within the City of San Diego is under the supervision of the" Mayor and delegates to the Mayor "the power to promulgate rules and regulations regulating such

17

collection and subsequent transportation and disposal, including but not limited to … [c]ollection routes and scheduling and designation of disposal sites and any limitations thereon" and "[s]ervice standards and pickup locations." The WMR's rules concerning how much space is required for collection fall squarely within this delegation of authority and effectuate the ordinance's purpose to regulate refuse collection and require residences to adjust to the collection technology used by the City.

The reasonable access rules, which prohibits City employees from entering private property and precludes service if residences do not have access to a collection point, likewise fall directly within the authority granted by San Diego Municipal Code section 66.0127, subdivision (c)(3), which states that the "City shall not enter upon any private property to collect any refuse …." The Homeowners' assertion that the City did not have authority to include this prohibition in the WMR is plainly without merit.

In sum, we agree with the trial court's conclusion that the WMR was duly authorized by the San Diego Municipal Code and was not " 'arbitrary, capricious or [without] reasonable or rational basis.' " (*Wallace Berrie & Co. v. State Bd. of Equalization, supra*, 40 Cal.3d at p. 65.)[6]

---

[6]   In a disjointed argument in their briefing, the Homeowners contend the two memoranda written by the City Attorney in 2017 concerning the collection of refuse in Mission Beach contradict the City's position and show the regulation was not authorized by the electorate. As noted above, these documents were produced by the City prior to its filing of the motion for summary judgment, but only introduced by the Homeowners after the motion was granted as part of their motion for reconsideration of the summary judgment ruling. As the City points out, the Homeowners make no argument to this court concerning the trial court's denial of the motion for reconsideration, nor do they provide any basis for this court to consider the documents. Additionally, these documents address the City's collection of refuse from short-term vacation rentals, and we fail to see their relevance to this case.

18

## III

### *There Are No Triable Issues of Material Fact*

The Homeowners next contend that the trial court erred by concluding there were no triable issues of material fact with respect to their equal protection claims.  Specifically, they argue there was disputed evidence concerning (1) whether their properties were properly categorized by the City as multi-family; (2) whether the City had a rational basis to treat multi-family and single-family residences differently; and (3) whether the City had a rational basis for its reasonable access requirement.

### A

### *Equal Protection Standards*

" ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." ' [Citation.]  'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' [Citations.]  This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for the purposes of the law challenged.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 (*Cooley*), italics omitted.) "[N]either the Fourteenth Amendment of the Constitution of the United States nor the California Constitution [citations] precludes classification by the Legislature or requires uniform operation of the law with respect to persons who are different." (*People v. Guzman* (2005) 35 Cal.4th 577, 591.)

B

*The WMR's Contiguous Space Requirement*

The Homeowners contend that conflicting evidence about the proper characterization of their properties precluded summary judgment of their equal protection claims based on the WMR's setout space requirements. This assertion is intertwined with their contention that they were treated differently from single-family residence owners for purposes of the requirement without any reasonable justification for the disparity.

As an initial point of clarification, the WMR does treat multi-family and single-family residences in *slightly* different manners with respect to the regulation's space requirements. Both types of housing are subject to the WMR's general eligibility requirement that the facility's public collection point have adequate space for proper placement and separation of the required number of containers. The specific space requirements for multi-family residential facilities, however, are set forth both in Attachment 1 to the WMR and in the WMR's conditions of service. Single-family homes, on the other hand, are not subject to the space requirement in Attachment 1, only to the space requirement in the conditions of service.

As described, the WMR requires the "[o]wners/managers of multi-family Residential Facilities seeking to transfer from privately contracted collection services to City Force provided Collection Services" to meet the requirements of Attachment 1 to the WMR. In turn, the attachment states that the "dedicated public streets and/or dedicated public alleys which will serve as collection locations must have adequate space for the proper placement and separation of all Refuse and Recyclable Material containers …." Further, "the amount of curbside or alley frontage … must be equal to or greater than five (5) linear feet for each container …."

20

Single-family homes are subject to the same restriction, but it appears in the condition of service section of the WMR. As the City explains, like the requirement for multi-family homes contained in Attachment 1, the conditions of service require all homeowners to have room for three feet of space between their containers and other objects. Although the space requirement is explained in a slightly different way in Attachment 1, the requirements are the same. We agree with the City that the distinction drawn by the Homeowners is one without a difference, and is not " 'a classification that affects two or more similarly situated groups in an unequal manner.' " (*Cooley, supra*, 29 Cal.4th at p. 253, italics omitted.) Accordingly, the Homeowners' equal protection claim based on this requirement was properly dismissed.[7]

Because we conclude there was no disparate treatment of similarly situated groups by the WMR with respect to its space requirements, we need not reach the Homeowners' argument that triable issues of fact remain

---

[7] Even if we were to assume the WMR treats single-family and multi-family properties differently by making the requirement an eligibility requirement rather than a condition of service, it is self-evident that differing treatment would be appropriate because the two groups of property owners are *not similarly situated*. Multi-family properties are denser than single-family homes, on average creating a higher output of refuse and recycling material. This distinction logically requires more containers and correspondingly more space than what is required for a single-family home, providing a rational basis for different guidelines for these differently situated residents.

concerning the City's characterization of their property as multi-family.[8]  We note, however, that the manner in which the City determines whether a property is single- or multi-family, described in the City's December 15, 2016 denial letter as *"based upon whether multiple units are located on one parcel,"* is eminently reasonable.  (Emphasis added.)  Contrary to their assertions on appeal, the Homeowners provided no evidence showing that because a project is defined as single or multi-family for purposes of the City's building code, it

---

[8]     We also do not reach the Homeowners' claim that they were denied equal protection because they proffered evidence that other provisions of the WMR are not enforced.  Because there is no improper classification of similarly situated groups, this line of argument is moot.  Further, although the Homeowners extensively discuss evidence concerning the lack of enforcement of other provisions of the WMR and their claim that third-party refuse haulers are not subject to the WMR, they fail to explain how these facts relate to their equal protection claims.  It is not this court's role to connect the dots.  (See *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties."].)

must also be defined the same way for purposes of refuse collection.[9]  For this reason, the trial court's conclusion that no triable issues of material fact remained on this issue was appropriate.

C

*The WMR's Reasonable Access Requirement*

Even if the Homeowners had established an equal protection claim based on the WMR's space requirements, summary judgment would still be appropriate because the City also properly denied service based on the WMR's reasonable access requirement.  The Homeowners argue, in essence, that the City failed to provide a reasonable basis for the access requirement, thus violating their equal protection rights.  However, they provide no explanation of how the rule applies to their homes differently than any other City residence, multi-family or single-family.

The reasonable access rule, as previously described, states that "The City will not provide Residential Refuse Collection Services to *any Residential Facilities* in gated communities, located on private streets,

---

[9]     To support their contention that there was a triable issue of material fact concerning the City's classification of their residences as multi-family, the Homeowners rely on the deposition testimony of City officials who admitted the WMR does not define "multi-family dwelling."  However, the lack of a definition in the regulation does not show there was a misclassification.  The Homeowners also misquote the December 15, 2016 letter, inaccurately stating it "said that *the determining factor …* in denying Plaintiffs no fee service was that their houses were built under the City's multi-family Building Code."  The denial letter, however, states the determination is "based upon whether multiple units are located on one parcel."  That the 12-unit complex is located on one parcel is not disputed.  Similarly, the Homeowners look to the deposition testimony of a City official not involved in refuse collection who said that because the structures were detached townhomes they would be classified as single-family structures under the building code.  Again, this does not show the City misclassified these residences for purposes of the WMR.

23

addressed on public streets if any of the Residential Facilities in the gated community do not have Reasonable Access to a dedicated public street or dedicated public alley designated as suitable for City Force collection vehicles." (Italics added.) In turn, "Reasonable Access, means the Residential Facility is located immediately adjacent and contiguous to a designated collection point at the curb line of a City dedicated public right-of-way which is directly accessible from the Residential Facility property *and does not require moving the collection container across a private street, private alley, private communal driveway, or other private property* aside from the Residential Facility property." (Italics added.)

This rule applies to all San Diego residential facilities and the Homeowners have presented no evidence showing otherwise. For this reason, the Homeowners' equal protection claim based on the reasonable access requirement lacks merit and was properly dismissed by the trial court.[10] (*Cooley, supra*, 29 Cal.4th at p. 253.)

IV

*Homeowners' Payment to Third-Party Refuse Collector*

The Homeowners final argument is that the City is violating the People's Ordinance because the trash hauler employed by the Homeowners

---

[10] In their reply brief, the Homeowners belatedly assert that the reasonable access requirement is violative of their equal protection rights because "'[t]wo groups of residences are established by the WMRs: (1) those who own their own driveway; and (2) those who [like the Homeowners] co-own their driveway." We decline to address this untimely argument, which was also not raised in the trial court. (See *REO Broadcasting Consultants v. Martin* (1999) 69 Cal.App.4th 489, 500 ["This court will not consider points raised for the first time in a reply brief for the obvious reason that opposing counsel has not been given the opportunity to address those points [citations], particularly when the plaintiffs also failed to raise such issue before the trial court."].)

after they were denied service pays certain fees to the City and its disposal facility.  They posit that because they pay the third-party hauler, who then pays the City, they are paying the City for their trash service in violation of the Ordinance's guarantee of free service.  This argument is untethered from any allegation contained in the operative complaint, and does not relate to the judgment or the underlying challenged order made by the trial court.  The argument, thus, provides no legal basis for reversal of the judgment.

DISPOSITION

The judgment is affirmed.  Appellants shall bear the costs of appeal.


McCONNELL, P. J.


WE CONCUR:


BENKE, J.


DATO, J.

Filed 6/7/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LEO PERRY et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CITY OF SAN DIEGO,<br><br>    Defendant and Respondent. | D077064<br><br><br><br>(Super. Ct. No. 37-2017-00045772-CU-MC-CTL)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed May 17, 2021 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to: All parties